1
2
3
4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7    KYLE DICKEY,                             Case No.  14-cv-00629-WHO

                   Plaintiff,
8
9          v.                                 **ORDER GRANTING PLAINTIFF'S
                                              MOTION FOR SUMMARY JUDGMENT
10   CAROLINE COLVIN,                         AND DENYING DEFENDANT'S
     Acting Commissioner of Social Security,  CROSS-MOTION FOR SUMMARY
                                              JUDGMENT**
11
                   Defendant.                 Re: Dkt. Nos. 19, 22
12

13                                      **INTRODUCTION**

14          Plaintiff Kyle Dickey seeks disability insurance benefits and supplemental security income

15   because he suffers from astrocytoma, cognitive disorder, depression, and emotional lability.  In

16   denying Dickey's claims for benefits, an Administrative Law Judge ("ALJ") relied on a medical

17   opinion from 2003 to improperly discount more recent medical opinions from 2010 and 2011 and

18   effectively ignored the lay testimony of Dickey's step-father, a psychologist.  Failing to credit the

19   more recent evidence led the ALJ to disregard the vocational expert's answer to a hypothetical that

20   established Dickey's inability to engage in substantial gainful activity.  Because of these errors, I

21   GRANT Dickey's motion for summary judgment, DENY the Commissioner's, and REMAND this

22   matter for an award of benefits.

23                                      **BACKGROUND**

24   **I.  PROCEDURAL HISTORY.**

25          On February 25, 2010, Dickey filed an application for DIB under Title II of the Social

26   Security Act, alleging disability since January 1, 2006.  Administrative Record ("AR") 149-152.

27   The following day, on February 26, 2010, Dickey filed an application for SSI under Title XVI of

28   the Social Security Act.  AR 153-56.  In his disability application, Dickey listed "[a]strocytona

*United States District Court*
*Northern District of California*

[g]rade 1, depression, brain damage, and emotional liability coordination" as physical or mental conditions that limited his ability to work.  AR 180.  Both applications were denied initially on July 30, 2010 and upon reconsideration on March 22, 2011.  AR 89-92, 93-97, 98-102.  Dickey filed a request for hearing on May 5, 2011.  AR 105-06.

On April 19, 2012, the ALJ conducted a hearing where Dickey, Dr. Russell Chapman (Dickey's stepfather), and Kelly Bartlett (an impartial vocational expert) testified as to Dickey's alleged disability.  AR 37-66.  Following the hearing, Dickey submitted additional evidence regarding his disability including records from emergency room visits and a signed affidavit from Dr. Chapman both in his capacity as Dickey's stepfather and as a licensed counselor and clinical psychologist.  AR 253-55.  The ALJ rendered a decision on May 23, 2012, finding that Dickey was not disabled and had not been under a disability from January 1, 2006, through the date of the decision.  AR 30.

On August 1, 2012, Dickey's attorney submitted a request for review to the Appeals Council.  AR 257-264.  The Appeals Council declined review and the ALJ's decision became the Commissioner's final decision on January 6, 2014.  AR 1-6.  Dickey filed this action for judicial review pursuant to 42 U.S.C. § 405(g).  Dkt. No. 1.

## II.  DICKEY'S BACKGROUND AND IMPAIRMENTS.

After experiencing episodic vomiting and headaches, Dickey underwent neurosurgery to remove a cerebral tumor on August 19, 1997.  AR 350.  He was thirteen years old.  After the surgery, Dickey experienced emotional disturbance, difficulty concentrating, aggressive outbursts, and immature behavior, but showed no signs of tumor recurrence.  AR 334-349.  His doctor at that time, Dr. Boutilier, recommended that Dickey be home-schooled until his behavioral symptoms disappeared.  AR 344.  Dickey completed eighth grade via home school.  AR 366.

Dickey went back to school on a full time basis at the beginning of ninth grade and initially showed improvement.  He began to experience depression in 2000 and was prescribed medication to control his attention and emotional problems.  AR 336, 366, 339.  In the second semester of ninth grade, he obtained an individualized education program based on eligibility for "Exceptional Children's Services as Other Health Impaired."  AR 366.  As a result, he had increased time for

completion of assignments, preferential seating, and rest periods as needed. *Id.* He was still placed in regular academic classes with approximately one hour per day in the curriculum assistance class, and graduated from high school in June 2002. AR 25.

Between 1997 and 2002, medical records and MRIs showed no tumor recurrence. Physical examinations only showed a tiny amount of ataxia on the left finger to nose testing. AR 334-350. In 2002, five years after his surgery, Dr. Boutilier noted that Dickey was doing very well and had no signs of headaches; she recommended a neuro-oncology follow up at Duke before Dickey moved to Greensboro, North Carolina. AR 334. Dickey was referred to Dr. Dunn, a clinical neuropsychologist from the Brain Tumor Center at Duke. She performed a neuropsychological evaluation to assess Dickey's reported behavioral problems, depressed mood, and changes in personality. AR 268. After administering a number of tests, she found, among other things, that Dickey (i) was functioning in the average range with respect to intellectual abilities; (ii) was performing fairly well with respect to visual attention tasks, although on a verbal attention and concentration task, Dickey had significant decreased speed of processing and increased distractibility; and (iii) was well within normal limits on higher level executive task, including abstract reasoning and set-shifting. AR 270. Dr. Dunn noted that the findings argued against any significant organic impairment with respect to frontal lobe abilities. AR 270.

The test results indicated that Dickey did not have significant impairment in functional memory. Expressive and receptive language abilities and visuospatial and visuomotor abilities were within normal limits. *Id.* Dr. Dunn also found that Dickey was not reporting symptoms suggestive of significant depressive symptomatology. *Id.* Ultimately, she observed that the evaluation did not suggest significant organic dysfunction with respect to higher level executive or frontal lobe processing and that Dickey's reported episodes of anger and poorly controlled emotional regulation was more likely "functional in nature" than linked to significant signs of organic sequelae from his brain tumor. *Id.*

The only area of concern that Dr. Dunn noted was Dickey's moderately decreased speed of processing and increased distractibility with respect to verbal attention and concentration testing. AR 271. In that respect, she recommended that Dickey try Ritalin or similar psychostimulant

United States District Court
Northern District of California

1    medication to alleviate some of the processing speed deficits in the verbal domain. *Id*. She also

2    recommended that Dickey engage in psychotherapy to address his emotional and mood

3    disturbances. *Id*. Dr. Dunn concluded that so long as Dickey's brain tumor remained free from

4    progression and "there [were] no significant changes in his neurological status," repeated

5    neuropsychological testing was warranted at 2-3 year intervals "to track any potential changes in

6    cognitive abilities." *Id*.

7        In the fall of 2003, Dickey enrolled in five courses at Guilford Technical Community

8    College in Jamestown, North Carolina. AR 251. He received an F in two of the courses, a

9    withdrawal from one course, and no grade for the other two courses. *Id*. No grade point average

10   ("GPA") was reported for the courses. *Id*. He enrolled in seven other courses, but it does not

11   appear that he completed them. *Id*. From 2001 through 2006, he worked part-time as an usher

12   and ticket seller at a movie theater, a grocery bagger, and table busser at a restaurant, earning a

13   high of $3,800 (in 2003) and a low of $600 (in 2005). AR 157-164. There are no reported

14   earnings after 2006, when he earned $1,300. AR 157.

15        In 2006, Dickey moved to California to live with his mother and stepfather. AR 44-45,

16   275. He claims that his last job was an on-call catering job at the University of California,

17   Berkeley in 2007. AR 44; Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") at 2. The job

18   was part-time and during the week he worked five or ten hours, although there were some weeks

19   when he did not work at all. AR 44; Pl.'s Mot. at 2.

20        Between 2009 and 2010, Dickey completed nine courses at Diablo Valley College in

21   Pleasant Hill, California. AR 250, 43. For the fall semester of 2009, he completed a course in

22   golf and another in U.S. history, receiving an A and a C, respectively. *Id*. In the spring of 2010,

23   he completed four courses: American Cinema (earning an F), Fundamentals of Oceanography

24   (earning a D), Intermediate/Advanced Golf (earning an A), and Flag Football (earning a C).

25   Finally, in the fall of 2010, he completed courses in the Visible Universe (earning a D), Physical

26   Geology (earning a B), and Intermediate/Advanced Golf (earning an A). *Id*. His cumulative GPA

27   was a 1.842. *Id*.

28        There are five medical reports from Dr. Metheney, Dickey's treating physician, between

4

2004 and 2009.  One concerns a repeat MRI of the brain, which showed no recurrence of tumor. Four are family medicine visit reports that Dickey's emotional lability was at issue.  Dr. Metheney prescribed medication for Dickey's reported manic depressive, anxiety, and occasional anger outburst symptoms.  AR 621-27.  She specifically noted that she believed Dickey's emotional lability was "secondary to trauma during the removal of the tumor in 1998."  AR 626.

Since 2010, Dickey has visited the hospital on several occasions with complaints of nausea, uncontrollable vomiting, backache, abdominal pain, and headaches.  AR 326-27, 562-65, 633-645.  In January 2010, Dickey obtained a medical marijuana card.  AR 628-632.

Dickey's other medical records since 2010 resulted from visits to consultants to assess his neurological issues.  The first resulted from a referral from the Department of Social Services.  AR 272.  In June 2010, Dickey met with Dr. Schwartz, a consultative examiner, for a psychological evaluation.  AR 272.  Dr. Schwartz diagnosed cognitive disorder due to brain tumor and neurosurgery, with depressed mood, history of cerebellar astrocytoma and surgical resection, damage to muscles in right eye, and assigned a Global Assessment of Functioning (GAG) score of 37.  AR 273-76.  She observed symptoms of depression and anxiety; intellectual functioning in the low average range; and strengths in verbal comprehension, working memory, visual motor coordination and reproduction, which fell in the average range.  *Id.*  She found Dickey: (i) severely impaired in his ability to maintain adequate pace, tolerate work stress, and interact with coworkers, supervisors, and the public; (ii) moderately impaired in maintaining adequate persistence and ability to adapt to changes in work environment; (iii) mildly impaired in following complex instructions; and (iv) not impaired in following simple instructions.  AR 276.  Dr. Schwartz also noted that Dickey reported he was unable to manage his own funds.  *Id.*

On July 2010, Dr. Paxton, a non-examining state agency consultant, reviewed the medical evidence and completed a mental residual functional capacity assessment, finding moderate limitations in Dickey's ability to understand and remember detailed instruction, carry out detailed instructions, and interact appropriately with the general public.  AR 282-84.  Dr. Paxton further noted that Dickey had "the capacity to do simple level work at two hour intervals in a non public setting [,] [c]oncentrative capacity [was] sufficient [,] [a]daptive capacity [was] also sufficient."

United States District Court
Northern District of California

AR 284.

In March and April 2011, Dr. Murray, a licensed psychologist, administered a number of tests to Dickey.  He concluded that Dickey could not meet the demands of full-time employment, would have great difficulty focusing, maintaining pace, and sticking to task, and that his episodes of rage could be easily triggered by changes in work settings or situations.  AR 611.  He observed that Dickey became mentally fatigued after two hours, necessitating a second test session, and had difficulty concentrating.  AR 608.  He opined that some findings were "consistent with an organic hypothesis, but not dementia" and that it was unlikely Dickey was attempting to fake brain damage because Dickey passed a malingering test.  AR 610.  Dr. Murray diagnosed Dickey with "Cognitive Disorder" as a result of long-term sequelae from his tumor removal and could not rule out organic depression.  AR 611.  He noted that literature in the field found significant long-term problems for attention, processing speed, interference and uncontrolled temper tantrums in patients who had undergone the type of tumor surgery Dickey had.  Dickey exhibited all of these symptoms.  *Id*.  Dr. Murray also cited other literature finding that pediatric tumor survivors may face many cognitive defects, including decline in intellectual functioning, and that "active involvement in mentally challenging activities [and other activities] might all be helpful in preventing further deterioration."  *Id*.

Dr. Murray completed a mental residual functional capacity assessment, noting Dickey's "marked" limited ability to: deal with the public; maintain concentration and persist in a task; perform activities within a schedule and maintain regular attendance; respond appropriately to changes in a work setting; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  AR 616.  According to Dr. Murray, Dickey exhibited "moderate" limitation in the ability to understand and remember technical and/or complex job instructions and to interact appropriately with supervisors and coworkers.  Dr. Murray found that Dickey had "mild" limitation in his ability to understand and remember detailed, but uncomplicated instructions, and "no limitation" in his ability to understand, remember, very short and simple job instructions.  *Id.*

United States District Court
Northern District of California

1    Dickey currently lives with his parents.  They help him when he needs assistance due to his

2    alleged impairments, including fatigue, vision, and emotional issues.  AR 255.  Although Dickey

3    has an unrestricted driver's license and drives short distances every other day in his parent's car,

4    AR 42, 254, Dickey is only allowed to drive nearby, to familiar locations, when he is not overly

5    fatigued or angry.  AR 254.  As a result, Dickey's mother or stepfather often drive him where he

6    needs or wants to go. Dickey also takes the train to visit his daughter in Modesto.  *Id.*

7    At the ALJ hearing, Dickey testified that he drives, hangs out with friends, gets fast foods,

8    vomits if he has too much stress or does not eat enough, has no patience, has a downward gaze, is

9    not fond of people, takes anti-nausea medication, uses medical marijuana for nausea and mood,

10   sleeps a lot, plays video games, shops at thrift stores, and does some chores when he remembers.

11   AR 45-52.  He also reported playing sports, watching television, using a computer, and reading the

12   news with one eye closed to counteract his paralyzed eye muscle.  AR 51.

13   Dickey's stepfather, Dr. Chapman, a licensed psychologist, testified at the hearing and also

14   submitted an affidavit after the hearing concerning Dickey's medical condition.  AR 252.

15   According to Dr. Chapman, and contrary to Dickey's hearing testimony, Dickey has no friends in

16   California, aside from his girlfriend and his brother, and one friend in North Carolina.  AR 253.

17   Dr. Chapman noted Dickey's difficulty with keeping friends because of his rage and emotional

18   issues.  He lacks empathy and sympathy.  AR 253-54.  Dr. Chapman explained Dickey's mood

19   and emotional issues in more detail, stating that Dickey had "blind rage" and that taking care of

20   basic tasks at home, like making the bed, eating meals, or taking care of hygiene, could cause

21   Dickey enough stress to lead him to an anxiety attack.  AR 254.  Dr. Chapman stated that Dickey

22   did not receive special accommodations when attending community college because Dickey was

23   unwilling to apply for them due to his false belief that he could do fine without them.  AR 253.

24   Lastly, Dr. Chapman contended that Dickey was unable to conform to a normal schedule,

25   understand the ramifications of his own personal interactions, or be self-sufficient.  *Id.*  As a

26   result, Dr. Chapman underscored that he and Dickey's mother were "constantly "on call" to

27   support Dickey and/or intervene as necessary—24 hours a day, 7 days a week."  AR 255.

28

7

### III. ALJ'S DECISION.

To assess residual functional capacity, the ALJ gave great weight to Dr. Dunn's 2003 opinion, because she had very specific expertise in the type of testing most relevant to Dickey's unique medical impairment.  AR 27.  Additionally, the ALJ gave some weight to the assessment by the non-examining consultant Dr. Paxton, since it was relatively consistent with psychometric results.  *Id.*  She gave no weight to the opinion of Dr. Schwartz because it appeared to be based on Dickey's and his mother's subjective complaints and the test results were similar to the test scores Dr. Dunn obtained, except for processing speed, which Dr. Schwartz described as impaired.  *Id.* Specifically, she found that the evidence did not show Dickey had significant impairment according to Dr. Schwartz's diagnosis due to evidence that Dickey was able to attend school, drive, hang out with friends, and play sports.  *Id.*  She believed Dr. Schwartz's opinion was informed by advocacy and not on objective results, and that Dr. Schwartz's evaluation was the result of a referral from Dickey's attorney.  AR 28.

The ALJ also gave no weight to the opinion of Dr. Murray, whom she believed was similarly attorney-referred.  *Id.*  She states that Dr. Murray's opinion was not consistent with the actual test results and, following Dr. Dunn's opinion, that Dickey's cognitive impairment was not the result of the tumor resection.  *Id.*  The ALJ concluded that nothing in the test scores or Dickey's activities of daily living indicated that he had "marked" limitation in the areas Dr. Murray referenced.  *Id.*

Finally, the ALJ indicated she gave some weight to Dr. Chapman's affidavit as a licensed psychologist.  But she gave more weight to Dr. Dunn based on her examining relationship and specific area of specialization.  *Id.*  Nowhere in the decision does the ALJ discuss Dr. Chapman's testimony about Dickey's psychological conditions and daily living activities.

### LEGAL STANDARD

### I.   STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.1996); *see also DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991)

United States District Court
Northern District of California

United States District Court
Northern District of California

("We review the ALJ's determination ... to determine whether it was supported by substantial evidence and whether it was based on the proper legal standard."). Substantial evidence means "'more than a mere scintilla,' but less than a preponderance." *See Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) (internal quotations and citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal quotations and citation omitted).

A court must review the record as a whole and consider adverse as well as supporting evidence. *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *See Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *See Robbins*, 466 F.3d at 882 (internal quotations and citation omitted); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). If the legal error is harmless, then a reversal is unwarranted. *See Molina v. Astrue,* 674 F.3d 1104, 1111 (9th Cir.2012) ("We may not reverse an ALJ's decision on account of an error that is harmless."). An error is harmless when it is "inconsequential to the ultimate nondisability determination." *Molina,* 674 F.3d at 1115 (internal quotations and citation omitted).

## II.  DISABILITY DETERMINATION.

A claimant is "disabled" as defined by the Social Security Act if: (1) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the impairment is "of such severity that he not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)-(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir.2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R § 404.1520(a)(4)(i)-(v).

In the first two steps of the evaluation, the ALJ must determine whether (1) the claimant is

United States District Court
Northern District of California

1    not performing substantial gainful activity, and (2) is under a "severe" impairment. *Id.* §

2    416.920(a)(4)(i)-(ii).  An impairment must have lasted or be expected to last 12 months in order to

3    be considered severe. *Id.* § 416.909.  In the third step, the ALJ must determine whether the

4    impairment meets or medically equals a listed impairment described in the administrative

5    regulations. *Id.* § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal one of

6    the listed impairments, before proceeding to the fourth step, the ALJ has to make a residual

7    functional capacity determination based on all the evidence in the record; this determination is

8    used to evaluate the claimant's work capacity for steps four and five. *Id.* § 416.920(e).  In step

9    four, the ALJ must determine whether the claimant is capable of performing his or her previous

10   job. *Id.* § 416.920(a)(4)(iv).  The claimant bears the burden to prove steps one through four, as

11   "[a]t all times, the burden is on the claimant to establish [his] entitlement to disability insurance

12   benefits." *Id.* (alterations in original).

13          Once the claimant has established a prima facie case, the burden shifts to the

14   Commissioner to show at the fifth step that the claimant is able to do other work, and that there are

15   significant number of jobs in the national economy that the claimant can do. *Id.* §§

16   416.920(a)(4)(v),(g); 416.960(c).  There are two ways for the Commissioner to show other jobs in

17   significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by

18   reference to the Medical–Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.  If the

19   ALJ chooses to use a vocational expert, hypothetical questions asked "must set out all of the

20   claimant's impairments." *Lewis v. Apfel,* 236 F.3d 503, 517 (9th Cir.2001) (internal quotations

21   and citation omitted).  The use of the medical-vocation guidelines, at step five is proper "where

22   they *completely and accurately* represent a claimant's limitations" and the claimant can "perform

23   the *full* range of jobs in a given category." *See Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th

24   Cir.1999) (emphasis in original).  Although "the fact that a non-exertional limitation is alleged

25   does not automatically preclude application of the grids," the ALJ must first determine whether

26   the "claimant's non-exertional limitations significantly limit the range of work permitted by his

27   exertional limitations." *Id.* at 1102.  If the Commissioner meets the burden at step five, the

28   claimant is not disabled. *See Tackett*, 180 F.3d at 1097–98.

**DISCUSSION**

## I.   THE ALJ'S FIVE-STEP ANALYSIS.

At step one, the ALJ found that Dickey had not engaged in substantial gainful activity since January 1, 2006, the alleged onset date.  AR 22. At step two, the ALJ determined that Dickey had the following severe impairments: (i) status post resection of astrocytoma (brain tumor) in remote past (August 19, 1997) and (ii) cognitive disorder.  *Id*.  At step three, the ALJ decided that Dickey did not have an impairment or combination of impairments that met or medically equaled the severity of any of those listed in 20 CFR Part 404, Appendix 1, Subpart P. AR 23.  At step four, the ALJ determined that Dickey had the residual functional capacity to perform a full range of work at all exertional levels, that he could make simple work-related decision with occasional workplace changes, and could have only occasional contact with coworkers and no contact with the public.  AR 24.  At step five, the ALJ determined that Dickey was able to engage in other types of substantial gainful work that exists in the national economy.  AR 29.  A finding of "not disabled" was directed by the Medical–Vocational Guidelines, section 204.00.  AR 30.

The ALJ, however, also found that Dickey's ability to perform all, or substantially all, of the requirements of his level of work was impeded by additional limitations.  AR 29–30.  To determine the extent to which these limitations eroded the unskilled occupational base, through the date of last insured, the ALJ asked a vocational expert whether jobs existed in the national economy for an individual with Dickey's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all of these factors, Dickey would be able to perform the requirements of several unskilled occupations such as: (i) mail clerk/sorter; (ii) photocopy machine operator; (iii) night cleaner; (iv) bench hand; and (v) surveillance system monitor.  AR 30.  However, when the ALJ asked the vocational expert to assume that Dickey would need to take three fifteen minute unscheduled breaks throughout a day and whether that would preclude all employment, the vocational expert testified in the affirmative, observing that a total of 45 minutes of unscheduled breaks would not be tolerated by employers at the unskilled level.  AR 59.  The ALJ relied on the first hypothetical but not the second, and found that Dickey

1    was not disabled and not entitled to SSI.  AR 30.

2        Dickey argues that: (i) the ALJ failed to consider Dickey's limitations, as supported by

3    substantial evidence in the record, in determining his RFC and the appropriate hypothetical for the

4    vocations expert, and (ii) the ALJ committed abuse of discretion and legal error by affording no

5    weight to the opinions of Dr. Murray and Dr. Schwartz.  Pl's. Mot. at 1.

6    **II.  THE ALJ IMPROPERLY DISCREDITED DRS. MURRAY AND SCHWARTZ IN**
     **FAVOR OF DR. DUNN AND FAILED TO ACCURATELY ANALYZE DICKEY'S**
7    **ACTIVITIES OF DAILY LIVING.**

8        "The opinion of an examining doctor, even if contradicted by the opinion of another

9    doctor, can only be rejected for specific and legitimate reasons that are supported by the record."

10   *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (internal quotations and citation omitted).

11   When an ALJ fails to provide adequate reasons for rejecting the opinion of a treating or examining

12   physician, the Ninth Circuit credits the opinion as true as a matter of law.  *Lester v. Chater*, 81

13   F.3d 821 (9th Cir. 1995).  The Ninth Circuit has also held that where a claimant's condition is

14   progressively deteriorating, the most recent medical report is most probative of disability.  *See*

15   *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

16       Dickey argues that the ALJ (i) committed legal error and abuse of discretion by affording

17   no weight to the opinion of Dr. Murray, an examining source;[1] (ii) erred by omitting material facts

18   from Dr. Dunn's report, to which she otherwise gave great weight; (iii) committed legal error by

19   giving weight to the opinion of Dr. Paxton, a non-treating, non-examining source; and (iv) erred

20   by rejecting the opinion of examining source, Dr. Schwartz.  Pl's. Mot. at 7–11.

21       The Commissioner contends that the ALJ properly gave no weight to Dr. Schwartz's

22   opinion because it conflicted with the opinion of Dr. Dunn, which the ALJ gave great weight, and

23

24   [1] The Ninth Circuit classifies the three types of physicians that can provide information on a
     claimant as: "(1) those who treat the claimant (treating physicians); (2) those who examine but do
25   not treat the claimant (examining physicians); and (3) those who neither examine nor treat the
     claimant (non-examining physicians)."  *Lester*, 81 F.3d at 830.  Dickey improperly classifies Dr.
26   Murray as a treating source.  Pl's. Mot. at 7.  Dickey's primary care physician, Dr. Daniel Lee,
     referred Dickey to Dr. Murray.  *Id.*  Those who examine but do not treat the claimant are
27   considered examining physicians.  *Lester*, 81 F.3d at 830.  Dr. Murray is an examining physician
     because there is no evidence in the record to suggest that Dr. Murray treats Dickey.  Dr. Murray
28   only saw Dickey on two occasions to complete the neuropsychological screening.  AR 567.

United States District Court
Northern District of California

because Dr. Schwartz's opinion appeared to be based on Dickey's and his mother's subjective complaints.  Opp. at 4; AR 27.  Similarly, the Commissioner noted that Dr. Murray's opinion was given no weight because it speculated that cognitive impairment was the result of tumor resection when Dr. Dunn believed in 2003 that was not the case.  Opp. at 6-7.

I conclude that the ALJ erred and improperly discredited the opinion of Dr. Schwartz.  An ALJ is entitled to draw inferences logically flowing from the evidence.  *See Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir.1982).  But here, it is unclear how the ALJ drew the inference that Dr. Schwartz's opinion was tainted by Dickey's or his mother's subjective complaints.  Dr. Schwartz's report does not mention Dickey's mother at all.  The report is based on Dr. Schwartz's tests and observations of Dickey.  AR 272-76.  The ALJ failed to provide adequate reasons for rejecting the opinion of Dr. Schwartz, an examining physician; as such, I must credit the opinion as true as a matter of law.  *See Lester*, 81 F.3d at 821.

The ALJ also erred in discrediting Dr. Murray's report.  It is the most recent medical report probative of disability.  *See Young*, 803 F.2d at 963.   Yet the ALJ dismissed it because it concluded that cognitive impairment was the result of tumor resection, a conclusion that contradicted Dr. Dunn's opinion.  AR 28.  However, Dr. Murray's report in 2011 cited articles that link the behavior issues Dickey exhibited to patients who had undergone posterior fossa tumor resection.  AR 611.  These were not addressed by Dr. Dunn in 2003.  Indeed, Dr. Dunn did not "rule out" then that Dickey's behavioral issues were not related to the tumor and removal, but found them "more likely to be functional in nature."  AR 270.

More significantly, Dr. Dunn acknowledged that Dickey's condition could deteriorate, noting that as long as "no significant changes in his neurological status" occurred, testing was indicated at only 24-26 month intervals.  AR 271.  In those circumstances, it was improper for the ALJ to rely on Dr. Dunn's report, which was nine years old, to dismiss Dr. Murray's more recent diagnosis of Dickey's impairments, which had occurred within the previous year, especially when Dr. Murray's tests showed increased deterioration in Dickey's functioning.

Dr. Murray's report finds that Dickey had "marked" limited ability to: deal with the public; maintain concentration and persist in a task; perform activities within a schedule and maintain

13

United States District Court
Northern District of California

1   regular attendance; respond appropriately to changes in a work setting; complete a normal

2   workday and workweek without interruptions from psychologically based symptoms; and perform

3   at a consistent pace without an unreasonable number and length of rest periods.  AR 616.  In

4   addition, Dr. Murray noted that Dickey exhibited "moderate" limitation in the ability to

5   understand, remember, technical and/or complex job instructions, and ability to interact

6   appropriately with supervisors and coworkers; and "mild" limitation in ability to understand,

7   remember, detailed, but uncomplicated instructions.  *Id.*  These opinions were corroborated in

8   large measure by the testimony of Dr. Chapman, Dickey's stepfather.

9          The ALJ also rejected Dr. Murray's report because she did not find that the test scores or

10   Dickey's daily living activities supported Dr. Murray's conclusion that Dickey had marked

11   limitations.  AR 28.  This is not supported by the record.  According to the ALJ, Dickey's daily

12   living activities included playing video games, watching television, driving, and hanging out with

13   friends.  But the ALJ overstated Dickey's ability to accomplish various daily activities.  As

14   discussed in Section III, the ALJ did not address the testimony of Dr. Chapman that Dickey's

15   daily activities were far more limited than Dickey had described and that Dickey was not a reliable

16   source as to his activities and abilities.  Moreover, the ALJ did not explain how these activities

17   involved skills that could be transferred to the workplace.  *See* AR 28.

18          The Ninth Circuit has held that "the mere fact that a plaintiff has carried on certain daily

19   activities ... does not in any way detract from [his or] her credibility as to [] overall disability."

20   *Orn,* 495 F.3d at 639 (internal quotations and citation omitted).  An adverse credibility finding

21   based on activities may be proper "if a claimant engages in numerous daily activities involving

22   skills that could be transferred to the workplace."  *Id.*  "The ALJ must make "specific findings

23   relating to [the daily] activities" and their transferability to conclude that a claimant's daily

24   activities warrant an adverse credibility determination."  *Id.*

25          The ALJ erred in finding that Dickey's disability allegations were not credible because of

26   his ability to perform such an "extensive array of activities."  *Id.*  To the contrary, the activities

27   described by the ALJ appear "so undemanding that they cannot be said to bear a meaningful

28

1    relationship to the activities of the workplace." *See Orn,* 495 F.3d at 639.[2]

2           Finally, the ALJ dismissed Dr. Schwartz's and Dr. Murray's reports because she claimed

3    they were "attorney-referred."  She did not explain how she arrived at the conclusion that both

4    doctors were attorney-referred, and it is unclear whether her supposition is accurate. [3]  More

5    importantly, she did not articulate how that fact, if true, created grounds for suspicion as to the

6    legitimacy and value of the reports themselves.  *See Nguyen*, 100 F.3d  at 1462 (finding that the

7    fact that evidence in proceeding for SSD and SSI benefits was devoid of any findings or

8    complaints relative to mental disorder of claimant for three years until claimant was examined by

9    psychologist at request of claimant's attorney was not legitimate basis on which to discount

10   psychologist's opinion that claimant had severe depressive disorder when psychologist's opinion

11   was not unsupported and contained no actual improprieties).

12          The ALJ also erred in giving some weight to Dr. Paxton's assessment, a non-treating, non-

13   examining source.  In the context of social security disability determinations, the opinion of an

14   examining physician is entitled to greater weight than the opinion of a non-examining physician.

15   *See Lester*, 81 F.3d at 830.  For the reasons previously discussed, the ALJ here could not give

16   more weight to the opinion of Dr. Paxton than to the opinions of examining physicians, Dr.

17   Murray and Dr. Schwartz, unless they were properly discounted.  *Id.*

18          In short, the ALJ failed to state sufficient reasons for discrediting the testimony of Dr.

19   Schwartz and Dr. Murray and explain why the reports were not given any weight although they

20   were the most recent medical opinions probative of disability.  Reversal on these issues alone is

21

22   _____

     [2] *See also Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("The Social Security Act does not
23   require that claimants be utterly incapacitated to be eligible for benefits . . .  and many home
     activities are not easily transferable to what may be the more grueling environment of the
24   workplace, where it might be impossible to periodically rest or take medication. Yet if a claimant
     is able to spend a substantial part of his day engaged in pursuits involving the performance of
25   physical functions that *are* transferable to a work setting, a specific finding as to this fact may be
     sufficient to discredit an allegation of disabling excess pain." (internal citations omitted)).
26   [3] There is ambiguity in the record as to whether Dr. Murray was attorney-referred.  Dickey claims
     Dr. Murray was not attorney-referred because Dickey's counsel was retained on May 2, 2011.
27   Pl's. Reply at 6.  However, there is evidence in the record showing that People With Disabilities
     Foundation was representing Dickey on January 10, 2011—months before Dickey visited Dr.
28   Murray.  AR 534-36.  The ALJ's decision does not clarify this ambiguity or otherwise explain the
     basis for referring to Dr. Murray as attorney-referred.

1   necessary.

2   **III. THE ALJ FAILED TO CONSIDER THE TESTIMONY OF DR. CHAPMAN.**

3         Lay testimony on the claimant's symptoms is competent evidence that the Commissioner

4   must take into account.  If the ALJ expressly determines to disregard it, she must give reasons

5   germane to each witness whose testimony is being rejected.  *See Nguyen,* 100 F.3d at 1462.  The

6   ALJ has the obligation to evaluate the testimony of witnesses and may not to ignore it.  *See Mason*

7   *v. Barnhart,* 63 Fed. Appx. 284, 286 (9th Cir. 2003) (unpublished); *see generally Social Security*

8   *Disability Law & Procedure in Federal Court* § 6:33 (2014).  If an ALJ fails to discuss competent

9   lay testimony favorable to the claimant, "a reviewing court cannot consider the error harmless."

10   *Stout v. Commr., Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).  The Ninth Circuit has

11   consistently reversed the Commissioner's decisions for failure to comment on such competent

12   testimony.  *Id.*

13         The ALJ did not adequately discuss Dr. Chapman's affidavit in her opinion even though

14   she purportedly gave Dr. Chapman's affidavit "some weight."  AR 28.  The ALJ failed to discuss

15   any of Dr. Chapman's opinions regarding Dickey's psychological issues or his daily life activities.

16   She failed to explain how Dr. Chapman's affidavit squared with her residual functional capacity

17   assessment.  *Id.*  She effectively ignored Dr. Chapman's detailed testimony concerning Dickey's

18   mood, emotional issues, and lack of empathy as well as his inability to accurately report his

19   activities and abilities.  Because the ALJ failed to evaluate the testimony of Dr. Chapman, remand

20   is appropriate.  *See Mason*, 63 Fed. Appx. at 286.

21   **IV. THE ALJ FAILED TO INCORPORATE DICKEY'S LIMITATIONS IN THE RFC**
22       **DETERMINATION AND FAILED TO RELY ON THE CORRECT VOCATIONAL**
         **EXPERT HYPOTHETICAL.**

23         If a claimant does not have the residual functional capacity to perform past relevant work,

24   then it is the Commissioner's burden at step five to establish that the claimant can perform other

25   work.  *Gamer v. Secretary of Health and Human Servs.,* 815 F.2d 1275, 1278–79 (9th Cir.1987).

26   The ALJ may use a vocational expert, as did the ALJ in this case, to determine whether a claimant

27   can use his work skills in another job.  While hypothetical questions asked of the vocational expert

28   must "set out all of the claimant's impairments," it is "proper for an ALJ to limit a hypothetical to

United States District Court
Northern District of California

those impairments that are supported by substantial evidence in the record." *See Gamer,* F.2d at 1279; *see also Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir.2001) (holding that it is "proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record.").

Dickey contends that the ALJ failed to consider the "limitation in ability to perform at a consistent pace without an unreasonable number of and the length of rest periods." Pl's. Mot. at 4. When the ALJ asked the vocational expert whether taking three 15 minute unscheduled breaks throughout the day would preclude all employment, the vocational expert answered that a total of 45 minutes of unscheduled breaks would not be tolerated by employers at the unskilled level. AR 59. Dickey argues this was the proper hypothetical that the ALJ should have relied on and had the ALJ relied on it, then the ALJ's conclusion would have been that there were no jobs in the economy for Dickey. Pl's. Mot. at 4. Dickey also contends that the ALJ failed to consider at the RFC stage and present to the vocational expert his limitation in ability to: (i) interact with supervisor; (ii) tolerate work stress; (iii) maintain adequate pace; (iv) maintain concentration and attention and persist in a task; (v) complete a normal workday or workweek without interruptions from psychologically based symptoms; and (vi) perform activities within a schedule and maintain regular attendance. Pl's. Mot. at 4-7.

The ALJ's first hypothetical to the vocational expert included only the limitations that the ALJ accepted as true in the residual functional capacity assessment. AR 24. However, she should have included the additional limitations in the hypotheticals to the vocational expert found in medical reports of Dr. Murray and Dr. Schwartz in determining Dickey's residual functional capacity assessment. *See Samples v. Commr. of Soc. Sec. Admin.*, 466 Fed. Appx. 584, 586 (9th Cir. 2012) (unpublished) (holding that the hypothetical question the ALJ had posed to vocational expert regarding claimant's ability to find work in national economy was defective when it ignored one of the doctor's diagnoses of functional limitation on claimant's ability to accept instructions from supervisors and to respond appropriately to criticism from supervisors).[4]

---

[4] The ALJ determined that Dr. Murray and Dr. Schwartz's observations conflicted with the observations of Dr. Dunn and Dr. Paxton. AR 27-30. As discussed, the ALJ erred in dismissing

United States District Court
Northern District of California

1    In her second hypothetical to the vocational expert, the ALJ included the frequent breaks, a

2    conclusion supported by Dr. Murray.[5]  The vocational expert responded that no job would

3    accommodate those limitations.  The ALJ also erred in failing to rely on the second hypothetical

4    and failing to explain why a finding of non-disability was still warranted when the vocational

5    expert's testimony was that 45 minutes of unscheduled breaks would not be tolerated by

6    employers at the unskilled level.

7    When Dr. Murray's and Dr. Schwartz's opinions are appropriately credited, the record

8    requires a finding of disability.  *See Orn*, 495 F.3d at 640.

9    **V.  REMAND FOR AWARD OF BENEFITS IS PROPER.**

10    "The decision whether to remand a case for additional evidence, or simply to award

11    benefits is within the discretion of the court."  *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir.

12    1987).  Here, there have been multiple legal errors.  The ALJ (i) failed to advance legitimate

13    reasons for disregarding the examining physicians' medical findings, reports, and opinion; (ii)

14    impermissibly relied on Dr. Dunn as opposed to Dr. Murray and Dr. Schwartz, despite Dr. Dunn

15    noting that Dickey's condition could deteriorate and testing was indicated every 2-3 years to check

16    for deterioration; (iii) effectively ignored the testimony of Dr. Chapman; and (iv) did not

17    incorporate the vocational expert's limitation in her decision.  Crediting the opinions of Dr.

18    Murray and Dr. Schwartz as true, and relying on the second hypothetical given to the vocational

19    expert, I find that this case has a full record and one in which no additional proceedings are

20    necessary to further develop the administrative record, and therefore remand for an immediate

21    award of benefits.  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).

22

23    Dr. Murray and Dr. Schwartz's observations in favor of Dr. Paxton and Dr. Dunn.  The ALJ
      should have included the limitations described by Dr. Murray and Dr. Schwartz.  *See Samples*, 466

24    Fed. Appx. at 586.
      [5] For example, Dr. Murray's report included a residual functional capacity assessment noting an

25    inability to perform activities within a schedule and maintain regular attendance, complete a
      normal workday and workweek without interruptions from psychologically based symptoms, and

26    perform at a consistent pace without an unreasonable number and length of rest periods.  *See* AR
      616.  Dr. Schwartz's report noted that Dickey became mentally fatigued after two hours,

27    necessitating a second test session.  *See* AR 608.  He opined that Dickey had a marked inability
      (30% or greater) to complete a normal workday without "interruptions from psychologically based

28    symptoms, and perform at a consistent pace without an unreasonable number and length of rest
      periods.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the reasons above, I REVERSE and REMAND for payment of benefits. Dickey's motion for summary judgment is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

**IT IS SO ORDERED**.

Dated: November 19, 2014

_____
WILLIAM H. ORRICK
United States District Judge